The first case on the calendar is Steamfitters Local 449 Pension v. Skechers U.S.A, Inc. And we have Mr. Goldsmith for the appellant. Good morning. Good morning, Your Honor. Your Honors, good morning. May I begin? Yes. Thank you. Thank you, Your Honors, and may it please the Court. My name is David Goldsmith. I'm with the law firm of Labiton-Zuchero. With me virtually this morning is my partner, Carol Villegas. Together, we represent the lead plaintiff in this securities fraud class action, the Cavalier Fundamental Growth Fund, and the alleged class. This case, Your Honor, as I said, is a securities class action. This appeal comes to this Court on the dismissal of our second amended complaint. This is on de novo review. And I'd like to start, if I may, on the element of scienter. There were two elements that were disputed by the defendants in this case, falsity and scienter. I'd like to start with the scienter element, if I may, and in particular, with one of the two individual defendants who we sued in the case. There are two individual defendants in addition to the company, Skechers. One individual defendant is Mr. Greenberg, the CEO, and the other individual defendant is Mr. Weinberg, the CFO, and also the Chief Operating Officer. And the main allegations with respect to Mr. Greenberg's scienter are a set of quite detailed allegations relating to his sales of his personally held Skechers stock. And he sold $101 million worth of his personally held Skechers shares during the only six-month-long class period. And our contention, your honors, is that these allegations strongly support an inference of scienter as to him. These sales were made with no 10B51 plan. He didn't purchase any shares during the class period. These sales were unusual and suspicious, both in the amount of shares that he sold and the profits that he was able to reap during the class period. They were unusual in timing as compared to other sales that were made outside the class period. And we did quite a detailed analysis looking at control periods of equal duration to the class period, before the class period, and after the class period. We also looked at numbers of years before and after the class period. We looked at amounts, as we said, and if you look at- I just ask you to focus on the safe harbor provision. I want to understand why, obviously, oral and written disclaimers were given warning investors about the difficulties in predicting demand revenue. And these were forward-looking statements, obviously. So why aren't these protected under the safe harbor provision? Not all of the statements were forward-looking. Which one? Tell me which one you would say was not forward-looking. So one of the statements that you had was by Mr. Weinberg during the July 29 second quarter conference call when he said that he hadn't seen any slowdowns. And that's one of the key statements that we have, that there were no slowdowns that he had seen. That's one. Other statements that I do want to mention before I get to the meat of your question, are statements that were made in the two 10-Qs. The statements that we allege were misleading are not only in the press releases and the conference calls for the first and second quarters, but also in the 10-Q quarterly reports that accompanied them. And we have item 303 claims with respect to those, in particular, that the risk factors that are in those 10-Qs were insufficient and nonspecific and so on. And that they didn't tell investors what was really going on inside the company in the wake of the port strike. But to answer your question, the basic reason why we don't believe the safe harbor applies is because these are largely misleading statements because of the omission of facts that the company was aware of at the time. There's a whole line of cases that the court is aware of, and we cite in our brief, that say that omissions take you out of the safe harbor. And when you have a statement that is falsely misleading because you are leaving facts out, then the safe harbor doesn't apply. What were the facts they left out? So there was a whole series of facts, Judge Wesley, that were left out in the wake of the port strike. So let's focus on, again, July 29th. This was the second quarter call. So what did they know on July 29th? First of all, they had had a whole cavalcade of canceled orders. So as we allege, nearly every one of their customers had canceled orders for the BTS season or the back-to-school selling season. From late May through the end of July, nearly every one of their customers had canceled orders because they had already ordered too much earlier in the year. And that resulted in a huge glut of inventory at Skechers. You also had a lack of backfill orders, which would have eased that glut and made up for the shortfall. The shortfall being the pull-in or shift of $20 million in orders that had occurred before. So you had a pull-in, we allege. Wasn't he asked about that? Wasn't Greenberg asked about that? Yes. So Weinberg was asked about the pull-in. Correct. And he disclosed the fact of the pull-in, although he was a bit unclear as to the size of it. Didn't he say that he would be somewhere in the neighborhood of $15 million? Yes. And it was $20,000, right? It was $20,000. Are you alleging that he knew that it was going to be $20,000 in July? Yes. How would he know that? How would he possibly know what was going to happen in terms of consumer demand in August and September? This was a moving target, wasn't it? No, because we allege that based on the timeline of this type of business, this type of long lead kind of business, any kind of pull-in for the third quarter would have happened by the middle of April. The public was well aware of this. This wasn't something that they were hiding. These analysts were asking about this all the time. How is this something that they hid? Here's the thing. Maybe he disclosed the fact of the $20 million pull-in, and maybe he disclosed that he wasn't sure whether there would be an equal shift from the fourth quarter to the third quarter, although we dispute that. But what he didn't warn is that you had this huge inventory overhang built up in the wake of the port strike. He didn't disclose that there was this ton of order cancellations and that there would be this lack of backfill orders. What he said was is that despite the pull-ins, the company would maintain 30% growth as it had in prior quarters, that it would keep rolling on quarter after quarter after quarter. He adopted the analyst consensus estimates for the second quarter of 2015. Let me ask you. You focused on what you believe are significant omissions. Is it your position that if there are significant omissions, the inclusion of cautionary statements is not sufficient, that the omissions carry the day, even if we think there are cautionary statements? Right, Your Honor. Thank you. One of the requirements, as the court is aware, is that you have to have meaningful cautionary statements. We do contend that the cautionary statements were not meaningful. That's a different point, whether they are adequate. It sounded like you were inviting us to say, look, there are omissions, and if we agreed with that, that carries the day for you. Or are you, as you now seem to say, acknowledging that if we thought the cautionary statements were good enough cautionary statements, they overcome the consequences of the omission? I understand, Your Honor, and they do not. An omission is an omission, and our position is that no amount of cautionary statement, unless it fills up the omission, unless the risk factor is sufficient to disclose the risk that the... Well, exactly, but that's the issue that I thought the district judge was getting at, and I assume we're going to hear from your adversary, that the cautionary statements were, as their name implies, cautionary. Sure. Well, if I could address that, the substance of that, there's only one real risk in there, and I think Ms. Rudzin will agree with me on this, that the risk that comes closest to getting to the actual guts of the issues here is there was a risk about decline in demand and possible cancellation of orders because of a lack of popularity of certain, you know, styles of footwear. Which statement are you referring to when you say that? Sure. So, in their 10-K, and I believe in all of their 10-Ks, and the 10-K is, to be candid, incorporated by reference in their 10-Qs, there is a... One of their risk factors, and it's the only risk factor which we would say has any real specificity, talks about the possibility of declines in demand and cancellation of orders because of a... And this is not a precise quote, but it talks about the lack of popularity of, or unpopularity. Don't they refer to slowdown strikes or other disruptions which could have a material adverse on our business? In the 10-K. They... I believe they do, but I don't think that tells you a lot considering the problems they had after the port strike. I mean, this was an enormous disruption on their business, and I think that's really... Falls more into the category of boilerplate, Your Honor. I think you'll find that in almost... Well, that's not... How can that be boilerplate? Not every company experiences disruptions at a port. That's hardly a generic... Okay, port, fair enough, but I mean, I think... I don't think that tells you enough about what really happened here. I mean, this was a tremendous disruption of the company... Well, they say which could have a material adverse effect on our business relationships with our customers and results of operations. So that's fine, but here's the problem. When they were saying that, Your Honor, these things were already at play. These things were already happening, and you can't ever have a risk factor that will be sufficient if the risk has already materialized, and this court has said that countless times. At the time of these risk factors being filed, these problems were already afoot. I mean, the port strike ended in February of 2015. The order cancellation started in late May, went through the end of July. So as of the July 29th call, the order cancellations had already happened, and Mr. Weinberg disclosed none of it and said things like, you know, strong selling, strong July incoming order rates, and strong sell-throughs, and double-digit backlogs, and he signed on to the 30% growth as a quarter after quarter after quarter, you know, we're on a roll sort of thing, and he signed on to the analyst consensus estimates. And just to remind the court, this company was unusual in the sense that they didn't post their own guidance. Most companies, as the court is aware, they put their own guidance out there. This company did not. I don't know why. They just signed on to what the analysts would say, and Mr. Weinberg said, well, we're comfortable with what you analysts have told us you think our earnings will be, despite the pullings, despite the fact that he warned that, well, maybe we won't make it up in the next quarter, but we're going to make it, we're going to make it, and they didn't. So, you know, I mean, what you read in Sketchers' brief is, well, analysts, they hear what they want to hear. What they heard, your honors, was that the company signed on to their consensus estimates in the absence of any competing estimate from the company itself. All right. Thank you. That, I think, is part of the issue. Thank you. I think we have your argument. All right. I know you've reserved three minutes for rebuttal. Okay. We'll now hear from counsel for the appellees. Ms. Rudson. Thank you, your honor. I'll start where we left off with the safe harbor with Mr. Goldsmith. Mr. Goldsmith says there's a line of cases that says the safe harbor doesn't apply if they claim an omission. That's simply not the law. There might be a few district court cases that say that, but it's not what the statute says. The statute says, in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading. Plaintiff's claim is that the CFO's optimistic statements about the future were misleading because he didn't disclose the call-ins and cancellations. That fits precisely in the safe harbor. And plaintiff cites no decision of this court holding that the statutory language can just be ignored. Mr. Goldsmith said repeatedly that the CFO said they would maintain 30% growth. That's simply not in the complaint and it's not in any of the transcripts. And he never said that. What he said was that he had comfort or he was comfortable with the second quarter, sorry, in the April earnings call, he said he was comfortable with the second quarter analyst estimates, which the company beat by almost 10%. That's not their claim. In July, he said he was comfortable with the analyst current consensus estimates for the back half of 2015. Sketchers beat that estimate. Plaintiff's complaint is that Q3 was down. Q3, the company, the analyst estimates were $876 million in sales. Sketchers had $856 million, a difference of 20 million or just 2.3%. This slight miss does not yield a reasonable inference that the CFO was trying to mislead investors. And in fact, as Mr. Goldsmith just said, their allegation is that there were $20 million in pull-ins that would have been known earlier in the second quarter, but then there were a whole bunch of cancellations. Well, if there were $20 million in cancellations in pull-ins and a whole bunch of cancellations, and they only landed $20 million short, by definition, that means that either there weren't a lot of cancellations, there weren't as many pull-ins as they say, or most likely, they got lots of other orders to make up for the pull-ins and cancellations. The CFO knew all of those things could happen. And so the CFO was not committing fraud when he expressed comfort in the larger number. And the problem with the complaint is that they don't quantify what these cancellations were worth. They seem to say that the effect on revenue would be $20 million. But that, as the court has noted, was disclosed. The CFO on the July earnings call said that sales had been shifted from Q3 to Q2. Whether that means they were pulled in or there were more orders in Q2 and then cancellations in Q3, he doesn't say because he never uses the term pull-in. It is undisputed that he told investors that Q2 had been extraordinary because of the shift and was not likely to be repeated. And when asked to quantify the shift, he said it's difficult. But if I had to guess, I would assume it was somewhere in the $15 million, $20 million range that normally would have gone into Q3. He didn't hide the fact of the shift. He didn't hide the $20 million potential gap in Q3. And he didn't hide the uncertainty that there was for Q3. He even told investors that it would be difficult for the company to make up the shift from Q4 because that's after the back-to-school season and a smaller quarter. So when Skechers missed Q3 analyst estimates by $20 million, no reasonable investor could claim that he hadn't been warned of that possibility. And as for the cautionary language that Mr. Goldsmith was talking about, what it says is our major customers have no obligation to purchase forecasted amounts, may and have canceled orders, and may change delivery schedules with minimal notice and without penalty. As a result, we may not be able to accurately predict our quarterly sales. This company told investors repeatedly that it can't predict future sales because its customers are uncommitted. But more important, we don't even need to get to the cautionary language because under the safe harbor, the statements are protected unless they were made with actual knowledge that the statements were false or misleading. As we noted in our brief... Can I just ask you a question about when I asked about the application of the safe harbor provision, aside from the alleged omissions, Mr. Goldsmith made reference to a statement, no slowdowns, that he said was not forward-looking, that was false. Can you address that? Sure. A statement wasn't particularly highlighted, so I don't remember exactly what it was. I don't know where that statement came from either, but I'm curious whether, was that in fact said? And if so, why is that outside the safe harbor? I think what he was saying, he being the CFO and I'm Mr. Goldsmith, was that he was asked if there was a possibility for a pull-in from Q4 to make up for Q3, and an analyst asked him that. And he said, it's possible because we haven't seen any slowdowns. But he said, in response to a different question, he said, it's possible, but it would be difficult because Q4 is a smaller quarter because it's after the back-to-school season. So I don't think he was saying... I mean, I don't know what qualifies as a slowdown anyway, so I don't know that that would be concrete enough to be a material misstatement, but I think that's maybe all that he said. He certainly repeatedly warned investors that a bunch of orders had shifted from Q3 to Q2, so they had some making up to do in Q3, and they might not achieve it. Can you address Sienta for a moment? Sure. The CFO made nearly all of the challenge statements, including every single oral statement on this earnings call that we're talking about, and he didn't sell a single share of stocks. That means not only did he not have a motive to commit fraud, but it undermines an inference that the CEO, who has just a couple of statements quoted in a press release where he signed the 10Q, it undermines any motive that he would have to commit fraud. But more important, the CEO didn't dump his stock right after these allegedly false positive statements were made, or right before the quote-unquote truth came to light. He sold his stock in chunks throughout the class period, and he retained about 85% of his holdings, making him probably the single biggest loser when the stock price dropped. So the notion that if he were thinking there's a fraud going on, putting aside the CFO either wasn't part of it or was willing to suffer to go along with it, if there was a fraud, he would have sold a lot more than 15% of his stock. Were his sales reported publicly during the class period? I'm sorry, I couldn't hear you, Your Honor. Were his sales reported publicly during the class period? I believe so. Yes, I believe so, Your Honor. I know that when executives sell stock, they have to file a Form with the SEC. I honestly don't know how soon after the sale those forms need to be filed. So I don't know if it was immediate or a little bit later. But you think they were within the class period? Yes, the CEO undisputedly made several sales in the class period. Not in the sale, but do you think the form was filed making public disclosure within the class period? Yes, I believe so, because I don't know how long afterwards it has to be reported, but I would imagine it has to be reported at least on a quarterly basis. So it would have been reported at the end of the quarter. Minimum threshold sale or any sale? I'm afraid I don't know the specific SEC rule, Your Honor, but I'm pretty sure it's any sale because it's a particular rule for CEOs or high officers. I'd like to turn just really quickly, my one minute left, to the easiest way to affirm the lower court's opinion. And that is that the plaintiff doesn't dispute that all of the statements are opinion statements, and they haven't pleaded sufficient facts for opinion liability under the Supreme Court's 2015 decision in Omnicare and this court's application of Omnicare in Tongue v. Santa Fe, both of which described the very narrow circumstances in which an opinion can lead to a securities fraud claim. We made this argument below that this court has held in Martin v. Quartermaine that expressions of optimism and projections about the future are quintessential opinion statements. Martin even says that estimates are a well-established species of opinions. These are opinions, we have a three-page argument in our brief explaining why plaintiff has not pleaded sufficient facts for Omnicare and Tongue, and they have no response. They don't mention either case in their opening brief or their reply. They don't argue these are not opinions. They offer nothing. And so before this court, the plaintiff has not disputed that all of the challenge statements are inactionable opinions. Thank you. Thank you, Mr. Hudson. Mr. Goldsmith, you have three minutes for rebuttal. I'm sorry. I was muted and with no video. Sorry. Excuse me. Thank you. May it please the court. I started in the dark. We won't count that on your time. Thank you. Thank you. Let me start by addressing Ms. Rudzin's comments about the selling. The district judge said only two things in dismissing the allegations of Mr. Greenberg's selling as insufficient. She said that he only sold about 17 percent of all of his shares, and because Mr. Weinberg had not that Mr. Greenberg had no motive probative of scienter. I mean, respectfully, I think that the latter holding in particular really should not stand. I mean, it's one thing to say that the clearly unusual and suspicious nature of Mr. Greenberg's selling might cast a bit of doubt on Mr. Weinberg's scienter if Mr. Weinberg didn't sell, but to suggest that it goes the other way and to say that because Mr. Weinberg didn't sell for any number of reasons that do not appear in the complaint or the record, to suggest that that means that Mr. Greenberg has no motive I think is a very, very dangerous precedent to set. It's nowhere in any case at all, and I think the SLM by Judge Pauly, which we cite in our brief, gives a good discussion of that. In terms of the percentage, Your Honor, it's a highly contextual motive as the court is aware. It's a highly contextual analysis. It's not enough to say that, well, just because you didn't sell every single share you've ever had and you only reaped $101 million and not a billion dollars that you had no defraud. He may have lost some money on the B shares, but this was his company that he founded and he obviously wanted to retain some control of his company, and these are things that can and should be addressed in discovery, and we have detailed allegations on that. Can I just ask you for one minute because I didn't get a chance to ask you in your main argument? You mentioned item 303, and I just wanted you to point me to any case, even under your own allegations, you say the industry norm that they would have got this a few weeks by mid-April and mid-July, but I haven't found any case that would suggest that that could constitute a trend, which is required, obviously, for purposes of an item 303-type argument. Is there some case I'm missing on that? The case that I would refer Your Honor to with respect to trends, one case is the CPI case. Another case that I would refer Your Honor to is Oklahoma v. Lexmark, which basically say that the length of a trend is a factual issue that shouldn't be dealt with on a motion to dismiss. This court in Stratton v. McClure said that you absolutely can have an item 303 claim on a quarter, on a queue. That suggests that a trend would lead up to a quarterly report as opposed to an annual report, and whether a trend is one month, two months, three months, that's really more of a factual issue. I don't think the court should be drawing those kinds of lines necessarily. Here, aren't we talking about weeks? We're not even talking about months. We're talking about weeks, right? Perhaps, but also let's recall that the language of the regulation doesn't only talk about trends. It also talks about uncertainties, and there are cases that we also cited, the Facebook case, and there's another case, the name of which is escaping me, that when you have an uncertainty, a material uncertainty that exists in the weeks, I think I'm quoting now, before the filing of a registration statement in those cases, you have to disclose that, and that's the rule. It's not just trends of over a long period of time, but an uncertainty as well, and we think the court strike was an uncertainty if there ever was one. All right. All right. Thank you, Mr. Goldsmith. We'll reserve decision. Thank you to both of you. Thank you very much, Your Honor.